FILED IN CHAMBERS
U.S.D.C. Rome

NOV 02 2007

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

PHILLIP WEATHERS, as
Administrator of the Estate of
Waymon Raynell Weathers,
Deceased,

        Plaintiff,

    v.

JAMES L. LANIER, DALE HERNDON,
PAUL BALLINGER, SUE SALADANJA,
DR. BOBBY CROCKER, DR. TERRELL
TANNER, DR. TERENCE DUNN, JOAN
NEWELL, SANDRA GILBERT, LT.
GATES, and CORRECTIONS OFFICER
MCCALLISTER,

        Defendants.

CIVIL ACTION

NO. 4:05-CV-11-RLV

O R D E R

This is an action under 42 U.S.C. § 1983, in which the plaintiff alleges that the defendants violated Waymon Raynell Weathers's rights by being deliberately indifferent to his serious medical needs in violation of the constitutional prohibition against cruel and unusual punishment. Pending before the court are the defendants' motions for summary judgment [Doc. Nos. 129, 131, 132, and 135] and the plaintiff's motion for leave to file a consolidated response to the defendants' motions [Doc. No. 146].[1]

---

[1] The plaintiff's motion is unopposed, and it is hereby GRANTED.

I. FACTUAL BACKGROUND

In December 2002, Waymon Raynell Weathers was a 45-year-old male, serving a ten-year sentence at Walker State Prison. He had a lengthy criminal history and had been incarcerated in several states on a variety of charges, including drug-related crimes, assault and battery, and attempted murder. He had a history of illegal drug use and cigarette and alcohol use. Additionally, he suffered from several chronic medical conditions, including hyperlipidemia and hypertension.

On December 19, 2002, Physician's Assistant A. Paul Ballinger ordered a drawing of Weathers's blood so that it could be tested to evaluate Weathers's health. The laboratory results showed that Weathers had elevated blood sugars and elevated triglycerides. As a result of this test Ballinger diagnosed Weathers with Type II diabetes (non-insulin dependent). At this time Ballinger ordered a 2000 calorie ADA diet for Weathers and fasting blood sugar tests three times a week to monitor his blood sugar levels. Weathers was also admitted to the diabetic clinic for regular follow-up treatment of his diabetes, and he was prescribed certain medication to treat the diabetes.

On December 27, 2002, Nurse Sue Saldana gave Weathers medication to treat his diabetes to take daily. Weathers signed that he had received the medication and also acknowledged that he had been instructed on how to take the medication, that he

2

understood how to take the medication, and that it was his responsibility to take the medication. On the same day, Ballinger also discussed with Weathers the importance of diet, weight loss, taking his medications, and having his blood sugar tested three times a week. At that time, Ballinger admitted Weathers to the general medical clinic to address both his cardiac and Type II diabetes problems.

Weathers had his blood sugar tested on January 3, 6, 8, 10, and 13, 2003. On January 13, 2003, Ballinger saw and evaluated Weathers. At this time, Weathers stated that for two weeks he had had flashing in his right eye. Ballinger took Weathers's vital signs and examined his vision. Ballinger noted that the vision was generally normal, and he found no evidence of hemorrhaging in Weathers's retina. He noted that Weathers had been diagnosed with Type II diabetes and hypertension. Ballinger prescribed new and additional medication to address these problems. On this same day, Saldana provided Weathers with medication for his diabetes and hypertension. Weathers again signed for receiving the medication and acknowledged that he had been instructed on how to take the medication, understood how to take the medication, and understood that it was his responsibility to take the medication.

On January 16, Weathers wrote a grievance stating that on January 14, 15, and 16 he had informed Ballinger, Lt. Gates, and Corrections Officer McCallister about blurred vision and his

3

equilibrium being off but that nothing had been done. The defendants contend that the grievance was never submitted and note that the grievance contains none of the indicia of a formally-filed complaint. Because the plaintiff has failed to show that the grievance was actually filed, the court finds that the defendants were unaware of Weathers's complaints. Moreover, since the grievance form is hearsay, the court does not accept the statements in there as being true.

On the evening of January 16, while the prison medical unit was still open, Weathers approached Lieutenant Jeannette Gates, a corrections officer, and stated that he was not feeling well. Gates instructed him to report to the medical unit, which he did. A few minutes later, Weathers returned and told Gates that Saldana had accused him of faking and had done nothing for him.

Approximately ten to fifteen minutes after the medical unit had closed, Weathers approached Gates and asked to be taken to the emergency room, since his equilibrium was off, and his peripheral vision was fading. Gates called the command bunker to see if Saldana had left the prison and was told that she had. Since Gates did not perceive Weathers as facing a crisis, she did not call for an ambulance. No further action was taken by any prison official that evening with regard to Weathers.

The following morning, January 17, a prison inspection team, which included Warden James L. Lanier, entered the dormitory where

Weathers was housed.   Weathers approached Lanier around 10:00 a.m. and stated that he needed medical attention.   Lanier spoke to the nurse accompanying him on the tour and was informed that Weathers was under ongoing care by the medical staff.

According to an affidavit by Myron Whiters, an inmate at Walker State Prison, Lanier told Weathers to stop complaining and that there was nothing he could do for him.   According to Whiters, Lanier directed that Weathers be placed in solitary confinement and that a correctional officer immediately placed Weathers into solitary confinement.   However, Lanier denies that Weathers was placed into solitary confinement at this time and states that immediately after the inspection, he went to the medical unit and spoke with Ballinger.[2]

A short time later, Lanier learned that Weathers had urinated into a trash can in the dormitory area.   According to Lanier, at this time he directed that Weathers be removed from the dormitory and placed in solitary confinement.   Shortly after ordering Weathers into solitary confinement, Lanier and Captain Larry Coker, a corrections officer, went to Weathers's cell.   Weathers appeared

---

[2] In ruling on the motions for summary judgment, the court will accept the testimony of Withers as being true.   However, whether Weathers was placed in solitary confinement at this time is irrelevant to a determination of whether he was subjected to cruel and unusual punishment for failure to treat his medical condition. Additionally, Ballinger states that Lanier did not talk with him that morning.   As discussed later, even if Lanier failed to talk with Ballinger, such failure would not constitute deliberate indifference.

upset, began crying, and kept repeating, "I've got problems.  I
don't know what it is.  I've got something wrong."  Lanier did not
send any person from the prison medical staff to visit Weathers.
Instead, at approximately 1:30 p.m., he ordered that Weathers be
transferred to Hays State Prison, which has a larger medical unit,
for further evaluation.[3]

Weathers was taken to Hays State Prison, and he was admitted
to the infirmary by Nurse Joan Newell.  Newell looked through his
chart and saw that Weathers had a history of elevated blood sugars.
She took his pulse, blood pressure, and temperature; she noted that
he "felt bad, hadn't felt good in days."  However, there is no
indication that Weathers told Newell that he was dizzy,
disoriented, or suffering from blurred vision.  Newell also did a
"finger stick" blood test before leaving for pill call, and that
test showed elevated blood sugars.  She recorded that information
and informed Nurse Kathy Smith and Dr. Terence Dunn.

Newell also recorded in the chart orders from Dr. Dunn to
continue Weathers's medications for diabetes and hypertension, to
test his blood sugars in the morning, and to provide him with a
special diabetic diet.  Newell had no further contact with Weathers
after this time.[4]

_____

[3] The evidence is in conflict as to whether Weathers was sent
for a medical evaluation or a mental health evaluation.

[4] This scenario is based on the deposition testimony of
Newell.  The plaintiff points out that there is no written medical

At some time between 2:00 p.m. and 4:00 p.m. Weathers was examined by Craig Glaze, a Mental Health Counselor. Weathers complained of elevated blood sugars, blurry vision, sinus problems, and an abscess above his right eye. Glaze found Weathers to be calm and subdued, with no visual or auditory hallucinations. Additionally, there was no evidence that Weathers was manic or depressed. Based on all this information, Glaze concluded that Weathers did not need mental health services, and he referred Weathers to the medical staff.

Smith began working around 3:00, and she learned that Weathers had been transferred to Hays. Around 5:00 p.m. Smith walked past Weathers's cell and, through the window, saw Weathers standing up, pointing toward the ceiling, shaking his finger, and making growling sounds. This behavior lasted approximately five minutes. Smith attempted to talk with Weathers, but he did not respond. A few minutes later, Weathers was on his knees, slobbering, and acting as if he were fighting an invisible person. Ten minutes later, Weathers was sitting against his cell wall, looking around, and beginning to respond to Smith. At 5:20 p.m., Weathers got up,

---

record to support this testimony. For purposes of the summary judgment motions, the court will assume that Newell and Smith did not do a medical intake evaluation of Weathers when he arrived at Hays. Moreover, it appears that Dr. Dunn was at the Hays infirmary between 5:00 p.m. and 6:00 p.m., when he left to go home, but that he never saw or treated Weathers.

7

climbed onto his bed, began looking over his shoulder as if someone were behind him, and started growling again.

Smith did a "finger stick" test and took Weathers's vital signs. He blood sugar level was 314; blood pressure was 159/95; pulse rate was 128; and respirations were 22. Smith felt that this blood sugar level was elevated but not alarming. Nurse Sandra Gilbert arrived around 5:30 p.m., and Smith had her contact the mental health director and make her aware of Weathers's overall condition. Based on her observations, Smith felt that Weathers's bizarre behavior might be the result of a mental health problem.

Around 5:30 p.m. Weathers informed Gilbert that he was a diabetic and that he had a history of seizures; however, he could not tell Gilbert what medications he was taking or had taken in the past. At 5:40 p.m. Smith asked Gilbert to contact Dr. Bobby Crocker, the on-call physician, and advise him of Weathers's condition. Dr. Crocker authorized Gilbert to have Weathers transported to Hutcheson Medical Center.

Gilbert then noticed that Weathers appeared to be exhibiting signs of clonic-tonic seizure. A few minutes later, Gilbert found Weathers in his cell, lying on his cot, appearing to be in a deep sleep. An ambulance was called at 6:00 p.m. At 6:30, Weathers was on the floor of his cell, and his arms and legs began jerking. This lasted approximately four seconds, and Weathers began to snore deeply. The ambulance arrived at 6:40 p.m.

Chattooga County Emergency Medical Services transported Weathers to Hutcheson Medical Center. While in transit, Weathers had another seizure and went into cardiac arrest. He was intubated and received CPR. Resuscitative efforts continued at Hutcheson, where the emergency room staff discovered that Weathers had been improperly intubated in the ambulance, in that the tube was placed down his esophagus and into his stomach instead of into his windpipe and into his lungs. The medical records indicate that Weathers was without oxygen for approximately 20 minutes. Weathers was reintubated and resuscitated. He was then transferred from the emergency department to the critical care unit at Hutcheson. Weathers's condition continued to decline, and he died the next day.

Dr. Lori Darrisaw, of the Georgia Bureau of Investigation, performed an autopsy, which revealed a cerebral infarct on the left occipital lobe of Weathers's brain. According to Dr. Darrisaw, Weathers's stroke was "an acute brain injury (ischemic stroke), which caused an acute delusional state, visual hallucinations and seizures." Affidavit of Dr. Lori Darrisaw, ¶ 5. The stroke caused "rapid respiratory depression, cardiopulmonary arrest, hypoxic brain injury and ultimately death. *Id.* She noted that diabetes mellitus was a significant contributing condition. However, Dr. Darrisaw later clarified that if she had known at the time of the autopsy that Weathers also suffered from hyperlipidemia and

hypertension, she would also have listed them as significant contributing factors.  *Id.* at ¶ 8.

## II. LEGAL DISCUSSION

As an initial matter, the court notes that in his reply to the defendants' motions for summary judgment, the plaintiff withdrew his claims against Officer McCallister, Deputy Warden Herndon, and Dr. Bobby Crocker.  Plaintiff's Brief in Opposition to Defendants' Motions for Summary Judgment at 51.  Consequently, the court grants summary judgment to these defendants without further discussion.

Warden Lanier and Lieutenant Gates moved for summary judgment on the basis that the plaintiff has failed to show a constitutional violation; the other defendants moved for summary judgment on the basis that they are entitled to qualified immunity.  The United States Supreme Court has set forth a two-part test for the qualified immunity analysis.  "The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation."  Hope v. Pelzer, 536 U.S. 730, 736 (2002); *see also* Saucier v. Katz, 533 U.S. 194, 201 (2001).  "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.  However, "[i]f a constitutional right would have been violated under the plaintiff's version of the facts, 'the next, sequential step is to ask whether the right was clearly

established." ,  Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002), quoting *Saucier*, 533 U.S. at 201.  Thus, the court must first analyze whether the defendants' conduct, taken in the light most favorable to the plaintiff, violated his constitutional rights.

Not every governmental action affecting the well-being of a prisoner is subject to Eighth Amendment scrutiny.  After incarceration, only the "unnecessary and wanton infliction of pain" constitutes the kind of cruel and unusual punishment forbidden by the Eighth Amendment.  Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 290 (1976).  *Estelle* specifically held that deliberate indifference to a prisoner's serious medical needs could constitute cruel and unusual punishment.

In Whitley v. Albers, 475 U.S. 312, 106 S.Ct. 1078 (1986), the Supreme Court made clear that mere negligence in dealing with a prisoner's medical needs would not be actionable under section 1983.

> To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety. . . .   It is obduracy and wantonness, not inadvertence or error in good faith, that characterizes the conduct prohibited by the Cruel and Unusual Punishments Clause. . . .

*Id.* at 319, 106 S.Ct. at 1084.

Refining this point, the Supreme Court in Wilson v. Seitger, 501 U.S. 294, 300, 111 S.Ct. 2321, 2325 (1991), stated: "If the pain

inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify [as being deliberate indifference to serious medical needs]."

In Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970 (1994), the Supreme Court further refined its analysis of the subjective component requirement and rejected the petitioner's invitation to adopt an objective test for deliberate indifference:

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This approach comports best with the text of the Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. . . .  But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

511 U.S. at 837-38, 114 S.Ct. at 1979.

Thus, conditions of confinement violate the Eighth Amendment proscription against cruel and unusual punishment only if they (1) rise to the level of a serious deprivation and (2) result from the official's deliberate indifference.  "*Wilson* and subsequent cases

12

refer to these two required elements as an 'objective component' scrutinizing the alleged deprivation and a 'subjective component' examining the official's mental intent." Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999); see also Lancaster v. Monroe County, Alabama, 116 F.3d 1419, 1425 (11th Cir.1997); Mandel v. Doe, 888 F.2d 783, 788 (11th Cir.1989) ("knowledge of the need for medical care and intentional refusal to provide that care constitute deliberate indifference").

After carefully and thoroughly reviewing the uncontested material facts of this case, the court concludes that the plaintiff has failed to show that any of the defendants was deliberately indifferent to the serious medical needs of Weathers.

The medical staff at Walker State Prison (Ballinger and Saldana) diagnosed and treated Weathers for his diabetes.[5] Although Saldana might have responded more aggressively when Weathers was brought to the clinic on January 16, 2003, in an effort to determine the exact cause of Weathers's blurred vision, there is no evidence that Saldana knew that Weathers's medical condition was of a nature that required immediate, serious attention. In fact, Saldana told Weathers that she would put in a request for Weathers to have an eye examination. Saldana's failure

---

[5] Dr. Tanner was the medical director at Walker State Prison during the relevant time. There is no evidence that Dr. Tanner knew of Weathers's condition other than in a general way. There is certainly no evidence that he had subjective knowledge of Weathers's condition but refused to treat him.

13

to take aggressive medical action at the most might have constituted negligence; however, such failure falls far short of deliberate indifference.

Moreover, the plaintiff has failed to present any evidence showing that the non-medical staff at Walker State Prison (Lanier, Gates, McCallister) were subjectively aware of Weathers's serious medical condition during the relevant time period but refused to help him.   Indeed, the evidence shows that they responded to Weathers's complaints by referring him to the medical staff. Although in retrospect it appears that Weathers *might* have benefitted if Gates had called for an ambulance that night, her failure to do so (based on the facts she knew at the time) does not constitute deliberate indifference.

The medical staff at Hays State Prison (Newell, Smith, and Gilbert)[6] admitted Weathers to that facility on January 17, 2003, and performed various medical tests on Weathers and later observed his bizarre behavior.   Although the plaintiff argues that the actions of the medical staff should have been more carefully documented, the plaintiff has failed to show that the medical staff

---

[6] Dr. Terence Dunn was Medical Director at Hays State Prison during the relevant time period.  He did not see Weathers or treat him in person.  Between 5:00 p.m. and 6:40 p.m. on January 17, he received a telephone call, informing him of Weathers's strange behavior.  He immediately gave instructions to call 911 and have Weathers's transported to the nearest medical facility.   The plaintiff has failed to show how such actions were improper and has certainly failed to show that such actions constituted deliberate indifference to Weathers's serious medical needs.

subjectively knew of Weathers's serious medical condition but failed to treat him.  Indeed, the evidence shows that all conditions or complaints of which the staff was aware were timely addressed; thus, the staff acted appropriately in treating and seeking treatment for Weathers, based upon its knowledge of his medical problems at the time.

Of course, to prevail on a section 1983 claim alleging deliberate indifference, a plaintiff must show that such deliberate indifference was the cause of the injury.  Carter v. Galloway, 352 F.3d 1346 (11th Cir. 2003); Hale v. Tallapoosa County, 50 F.3d 1579 (11th Cir. 1995).[7]  "Section 1983 thus focuses our inquiry on whether an official's acts or omissions were the cause--not merely a contributing factor--of the constitutionally infirm condition." LaMarca v. Turner, 995 F.2d 1526, 1538 (11th Cir. 1993).

The plaintiff acknowledges that Weathers died of a stroke that began on or shortly before January 16, 2003.  The plaintiff has not come forward with any evidence showing that Weathers's diabetes or the treatment regimen for his diabetes between December 22, 2002, and January 17, 2003, was the cause of his death.  As Dr. Darrisaw noted, the diabetes may have been a contributing cause (along with

---

[7] Both of these cases dealt with situations where the jail officials were alleged to have been deliberately indifferent to the risk of harm from other inmates.  However, this court sees no difference in deliberate indifference to harm from other inmates and deliberate indifference to serious medical needs with respect to causation.  Indeed, the sine qua non of a tort is that person's actions must have caused the injury.

several other factors--e.g., Weathers's hyperlipidemia and hypertension), but merely being a contributing factor is not enough.   This is especially true when the plaintiff has shown, at the most, that the defendants' treatment of Weathers's diabetes may have been mere negligence in some instances (and a finding of such negligence would occur only after construing the facts in a light more than favorable to the plaintiff).

For the foregoing reasons, the court concludes that the actions or omissions of the defendants do not constitute deliberate indifference to the serious medical needs of Weathers.   Because there has been no constitutional violation, the defendants are entitled to summary judgment.   The court need not reach the issue of whether the defendants are entitled to qualified immunity.

In summary, the plaintiff's motion for leave to file a consolidated response to the defendants' motions [Doc. No. 146] is GRANTED; the defendants' motions for summary judgment [Doc. Nos. 129, 131, 132, and 135] are also GRANTED.

SO ORDERED, this 2^nd^ day of ~~October~~ Nov., 2007.

ROBERT L. VINING, JR.
Senior United States District Judge